UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD R. RADER,                    Civil Action No.: 17-13674
                                     Honorable Avern Cohn
                    Plaintiff,       Magistrate Judge Elizabeth A. Stafford

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 15, 20]

Plaintiff Richard Rader appeals a final decision of defendant Commissioner of Social Security (Commissioner) denying his applications for disability insurance benefits (DIB) and supplemental social security income benefits (SSI) under the Social Security Act. Both parties have filed summary judgment motions, referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After review of the record, the Court **RECOMMENDS** that:

- Rader's motion [ECF No. 15] be **DENIED**;

- the Commissioner's motion [ECF No. 20] be **GRANTED**; and

- the Commissioner's decision be **AFFIRMED** pursuant to sentence

four of 42 U.S.C. § 405(g).

## I.    BACKGROUND

### A.    Rader's Background and Disability Applications

Born March 24, 1965, Rader was 49 years old when he submitted his applications for disability benefits in June 2014.  [ECF No. 10-5, Tr. 168, 175].  He has a tenth-grade education and past work experience as a heavy truck mechanic.  [ECF No. 10-6, Tr. 206].  Rader alleges a disability onset date of May 26, 2014, and that he is disabled by low blood pressure, diabetes, visual impairment, heart failure, hypernatremia, systolic dysfunction, non-ischemic cardiomyopathy, and hyperlipidemia.  [ECF No. 10-6, Tr. 205].

After the Commissioner denied both disability applications initially, Rader requested a hearing, which took place in November 2015, during which he and a vocational expert (VE) testified.  [ECF No. 10-2, Tr. 47-81]. In a July 26, 2016, written decision, the ALJ found Rader to be not disabled.  [*Id.*, Tr. 10-40].  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner, and Rader timely filed for judicial review.  [*Id.*, Tr. 1-5; ECF No. 1].

## B.     The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps.  First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1]  Second, if the claimant has not had a severe impairment or a combination of such impairments[2] for a continuous period of at least 12 months, no disability will be found.  *Id.*  Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled.  *Id.*  If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity, and will find the claimant not disabled if he or she can still do past relevant

---

[1] Sections 1520(a)(4) and 920(a)(4), which pertain to DIB and SSI respectively, list the same five-step analysis.

[2] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  § 1520(c); § 920(c).

work.  *Id.*  At the final step, the Commissioner reviews the claimant's RFC, age, education and work experiences, and determines whether the claimant could adjust to other work.  *Id.*  The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached.  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Rader was not disabled.  At the first step, he found that Rader had not engaged in substantial gainful activity since his alleged onset date.  [ECF No. 10-2, Tr. 16].  At the second step, he found that Rader had the following severe impairments: "Chronic heart failure, status post defibrillator implantation; non-ischemic cardiomyopathy; history of hypertension; orthostatic hypotension; diabetes mellitus; peripheral neuropathy; thrombocytopenia; and subcapsular cataracts."  [*Id.*].  Next, the ALJ concluded that none of his impairments, either alone or in combination, met or medically equaled the severity of a listed impairment.  [*Id.*, Tr. 19-22].

Between the third and fourth steps, the ALJ found that Rader had the

4

RFC to perform light work[3] except he:

> [C]ould lift up to 20 pounds occasionally; lift and carry up to 10 pounds frequently; no climbing ladders, ropes or scaffolds; occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl; avoid all exposure to extreme cold, to extreme heat and to excessive humidity; no exposure to excessive environmental irritants, such as fumes, odors, dusts, and gases; and due to the nature, frequency and intensity of symptoms due to physical conditions, work would be limited to simple, routine and repetitive tasks.

[*Id.*, Tr. 22].  At step four, the ALJ found that Rader was able to perform

past relevant work as a stores laborer, thus rendering a finding that he was

not disabled.  [*Id.*, Tr. 22-23].

## II.   ANALYSIS

### A.

Pursuant to § 405(g), this Court's review is limited to determining

whether the Commissioner's decision is supported by substantial evidence

and was made in conformity with proper legal standards.  *Gentry v. Comm'r

of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b) and 416.967(b).

"more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted).  Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

Rader argues that the ALJ erred in rejecting the medical opinions of record that found greater restrictions than those assessed in the RFC; in failing to have Rader's mental impairments assessed by a psychologist or psychiatrist; and in proffering an insufficient credibility analysis.  The Court finds that the ALJ's analysis of the opinion evidence is not supported by substantial evidence, and that the decision should be remanded for further consideration.

**B.**

Rader argues that the medical opinions in the record unanimously found that his restrictions are greater than those in the RFC assessed by the ALJ.  "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at

*2 (Soc. Sec. Admin. July 2, 1996). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir.2013) (same).

The "treating physician rule" requires an ALJ to give controlling weight to a treating physician's opinions regarding the nature and severity of a claimant's condition when those opinions are well-supported by medically acceptable clinical and diagnostic evidence, and not inconsistent with other substantial evidence.  *Gentry*, 741 F.3d at 727-29; *Rogers,* 486 F.3d at 242-43.  "Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors," and give appropriate weight to the opinion.  *Gentry*, 741 F.3d at 723.  In all cases, a treating physician's opinion is entitled to great deference.  *Id.*  An ALJ who decides to give less than controlling weight to a treating physician's opinion must give "good reasons" for doing so, in order to "make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *5 (1996)).

7

An ALJ is also required to consider the medical opinions of examining and reviewing medical sources, and "[t]he opinion of an examining medical source is generally given greater weight than the opinion of a non-examining source." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 525 (6th Cir. 2014) (citing 20 C.F.R. § 404.1527(c)(1)). But unlike opinions of treating physicians, the opinions of examining physicians are not entitled to any "special degree of deference"; while ALJs are required to consider them, they are not bound by them. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  Opinions from State agency physicians "can be given weight only insofar as they are supported by evidence in the case record...." Soc. Sec. Rul. No. 96–6p at 2. When weighing any medical opinion, an ALJ is required to consider the factors of supportability, consistency with the record and specialty.  20 C.F.R. § 404.1527(c).

Before addressing Rader's challenge to the ALJ's treatment of the medical opinions, a review of the relevant evidence is necessary.

## C.

Rader was admitted to Garden City Hospital in May 2014 with a diagnosis of "hyperosmolar hyperglycemic nonketotic state."  [ECF No. 10-8, Tr. 325].  He was also diagnosed with uncontrolled type two diabetes, ischemic cardiomyopathy, hypokalemia, dehydration, dyslipidemia, tobacco

8

abuse and hypertension.  [*Id.*].  He presented complaining of lower

extremity swelling and chest pain, had a blood sugar reading of 887, and

was treated with IV fluids, an insulin drip, and a left heart catheterization.

[*Id.*].  Rader had an ejection fraction of ten to fifteen percent and was given

a LifeVest (which acts a defibrillator) to try for eight to twelve weeks in an

attempt to improve his ejection fraction.  [*Id.*].  The physician noted that

Rader "may be a candidate for a heart transplant evaluation," though he

was able to be stabilized and discharged in early June.  [*Id.*].  He was

treated with medications, though the ALJ noted that his previous

medication use was intermittent, and Rader smoked two packs of

cigarettes daily.  [*Id.*; ECF No. 10-2, Tr. 23, citing ECF No. 10-8, Tr. 345,

353].

During Rader's stay, cardiologist Emmanuel Papasifakis, D.O.,

administered an echocardiogram that revealed severely reduced left

ventricular function, ejection fraction of only fifteen percent, dilation of the

left ventricle, global hypokinesis with anterior septal akinesis, a small

anterior pericardial effusion without tamponade physiology, and mild aortic

calcification with some restriction of motion.  [ECF No. 10-8, Tr. 375].  A

color flow Doppler showed mild tricuspid regurgitation, and a cardiac

catheterization showed nonischemic cardiomyopathy with a left bundle

9

branch block.  [*Id.*; ECF No. 10-9, Tr. 422-23].  Rader was ultimately diagnosed with hyperosmolar hyperglycemic nonketotic state, uncontrolled type 2 diabetes, ischemic cardiomyopathy, hypokalemia, dehydration, dyslipidemia, tobacco abuse and hypertension.  [*Id.*, Tr. 325].  The ALJ stated that Rader was discharged "in stable condition" but in fact, though his "sugar stabilized," his discharge condition was "guarded."  [*Id.*; ECF No. 10-2, Tr. 23].  He was fitted with a LifeVest and instructed to take medications; follow up with doctors; maintain a low-salt, diabetic diet; and return to his usual activity level.  [ECF No. 10-8, Tr. 325].

Rader returned to Dr. Papasifakis in June 2014, stating that his breathing was somewhat improved but that there were issues with hypotension.  [ECF No. 10-9, Tr. 407].  Dr. Papasifakis noted that his blood pressure remained low at the visit.  [*Id.*].  Rader also noticed lower extremity swelling since his discharge from the hospital and stated that he was down to occasional and rare tobacco use.  [*Id.*].  His physical examination was otherwise normal and he was encouraged to quit smoking, but Dr. Papasifakis noted that Rader had nonischemic cardiomyopathy and that ACE inhibitors and beta blockers could not be initiated due to very low blood pressure.  [*Id.*, Tr. 408-09].  Dr. Papasifakis added Lasix to Rader's medications and stated that "[Rader] cannot return

to work because of the severe cardiomyopathy and very low ejection fraction and low blood pressure.  Lower extremity swelling he [*sic*] shows some early cardiac decompensation."  [*Id.*, Tr. 409].  Dr. Papasifakis recommended he seek Social Security disability and scheduled Rader for a three week follow up.  [*Id.*].

In July 2014, Dr. Papasifakis found that Rader was "doing well at this time from a cardiac standpoint" and that there was "no sign of cardiac decompensation."  [*Id.*, Tr. 405].  But his blood pressure continued to run low and Dr. Papasifakis added low-dose Coreg to Rader's medications to benefit his cardiomyopathy.  [*Id.*].  He noted that "if there is a significant improvement in [Rader's] ejection fraction in 90 days life vest can be discontinued.  However, if the EF does not significantly improve he will require an implantable defibrillator."  [*Id.*].  One week later, Dr. Papasifakis again found no sign of cardiac decompensation and increased Rader's dosage of Coreg since he was tolerating it well.  [*Id.*, Tr. 401].

Later that month Rader was admitted to the emergency room for chest pain, though he was still wearing the LifeVest.  [ECF No. 10-16, Tr. 746-51].  He was seen by Dr. Papasifakis the following day.  [*Id.*, Tr. 752]. Rader described a sudden onset of left-sided chest pain, stabbing and sharp, that lasted for three hours and then remitted, similar to that which he

11

suffered in May 2014.  [*Id.*].  Rader denied palpitations, diaphoresis, and

shortness of breath, and there had been no activations of his LifeVest since

he began wearing it.  [*Id.*].  An EKG found normal sinus rhythm with a left

bundle branch block, which was also found in May 2014.  [*Id.*].

Recommendations included continuing the LifeVest, but Dr. Papasifakis

noted that Rader may need biventricular pacing or ICD in the future.  [*Id.*].

Rader continued seeing Dr. Papasifakis in August and September

2014, stating that he was doing better with his symptoms and denying

chest pain or shortness of breath.  [ECF No. 10-11, Tr. 515-19].  Still, his

Coreg dosage was reduced due to low blood pressure, and his ejection

fraction was reassessed to see if an implantable defibrillator was required.

[*Id.*, Tr. 516].  He was found compliant with medication and salt restriction

in September, though he had not quit smoking due to frustrations at home.

[*Id.*, Tr. 515].

Rader also began seeing Taha Alrahomi, M.D., that September.

[ECF No. 10-12, Tr. 533-36].  Initially, Dr. Alrahomi found mostly normal

results upon examination, though Rader appeared ill and had poor

judgment.  [*Id.*, Tr. 534].  Later that day Rader was admitted to the

emergency room for a low blood sugar of 20, and he was found to be

hypotensive but asymptomatic.  [ECF No. 10-16, Tr. 764-67].  He was

12

discharged the same day in stable condition.  [*Id.*, Tr. 767].  At a second visit with Dr. Alrahomi in September, Rader complained of severe leg and foot pain without relief from Neurontin, and upon examination had a rash on the right foot, severe onycholysis in all toes, and hypoesthesia.  [ECF No. 10-12, Tr. 540-42].

Rader returned two days later to be assessed for depression and anxiety, at which time Dr. Alrahomi made a medical source statement that Rader had bilateral leg pain and tingling, depression, hypoglycemia, shortness of breath and chest pain.  [*Id.*, Tr. 550-52; ECF No. 10-11, Tr. 494].  He found that Rader could only sit, stand or walk for one hour each during an eight-hour work day and would need to alternate positions every half hour.  [ECF No. 10-11, Tr. 494].  Dr. Alrahomi also found that Rader could only performing grasping, pushing, pulling, and fine manipulation for 20% of a work day, could not use feet for repetitive movements like foot controls, and that he could not lift or carry any amount of weight.  [*Id.*, Tr. 495].  He could frequently bend, occasionally squat and reach above shoulder level, but could never crawl or climb.  [*Id.*, Tr. 496].  Rader was also found unable to perform activities at unprotected heights, around moving machinery, driving automotive equipment, or with exposure to dust, fumes, or cases.  [*Id.*].  Dr. Alrahomi also opined that Rader would need

unscheduled breaks during the work day due to constant leg pain and tingling, to check blood sugar, to maintain good oral hydration, and to take his medications on time.  [*Id.*].  He concluded by noting that Rader was "a high risk for sudden cardiac death."  [*Id.*, Tr. 497].

Rader followed up with Dr. Alrahomi the next week, where he was found to be compliant with education, follow up, and medication regarding his poorly controlled diabetes.  [ECF No. 10-12, Tr. 558].  He complained of sensory neuropathy and fatigue, though his exam was normal.  [*Id.*, Tr. 559-60].  He missed his scheduled follow up with Dr. Alrahomi in October, but later that month was outfitted with an automatic implantable cardioverter defibrillator (AICD) by Dr. Papasifakis.  [ECF No. 10-16, Tr. 781].  Dr. Papasifakis noted Rader's history of nonischemic cardiomyopathy and persistent low ejection fraction, and that his Coreg dosage needed to be cut in half to tolerate his low blood pressure.  [*Id.*].

At a follow up in early November with Dr. Papasifakis, Rader complained of dizziness and shortness of breath.  [ECF No. 10-11, Tr. 509].  Dr. Papasifakis noted that his labwork had shown evidence of pancytopenia, that his weight was down 31 pounds in two months, and that he was tachycardic at 120 beats per minute.  [*Id.*].  Rader admitted that he was only taking Coreg and Lyrica and had stopped the other medications.

14

[*Id.*].  Physical examination revealed him to be cachectic and frail in appearance, with a grade one systolic heart murmur.  [*Id.*, Tr. 511].  Rader was sent to the emergency room, where he admitted to having fallen twice that morning, once striking his head on a door, and complained of weakness, dizziness, weight loss and shortness of breath.  [*Id.*; ECF No. 10-17, Tr. 831].  He stated that he had been short of breath ever since the defibrillator placement one week prior, and that it had gotten much worse over the past three days, to the point of being unable to walk ten feet before becoming short of breath.  [ECF No. 10-17, Tr. 842].

Upon examination in the emergency room, Rader had a standing blood pressure of 52/36 and positive temporal wasting.  [*Id.*].  He was assessed with presyncope, likely secondary to orthostatic hypotension. [*Id.*, Tr. 843].  William J. Nazzaro, D.O., planned to have the defibrillator inspected and to have Rader discontinue his Coreg home medication, and ordered an EKG.  [*Id.*].  Further examinations during his five-day hospital stay revealed thrombocytopenia secondary to hypocellular bone marrow; weight loss with asthenia, cause not clear; and persistent orthostatic hypotension, likely multifactorial, suspected to be secondary to autonomic neuropathy with poorly controlled diabetes.  [*Id.*, Tr. 844-47].

15

In December 2014 Rader reported feeling well to Dr. Papasifakis and having no more dizziness; his physical examination was normal and Dr. Papasifakis found that he had made "remarkable progress" and that "there is no sign of cardiac decompensation."  [ECF No. 10-11, Tr. 501-03].  But later that month he was again admitted to the emergency room.  [ECF No. 10-17, Tr. 872-90].  He was found to be suffering from acute diabetic ketoacidosis resulting from noncompliance with diabetes medication and discharged two days later.  [*Id.*, Tr. 872, 873, 877, 883-86].  Rader saw Dr. Alrahomi in late December, who noted his noncompliance with follow up, poorly controlled diabetes and continued tobacco use.  [ECF No. 10-12, Tr. 566].  Physical examination yielded entirely normal results.  [*Id.*, Tr. 569].  A follow up in January was substantially similar, after which Rader did not see Dr. Alrahomi until June 2015.  [*Id.*, Tr. 575-83].  This visit followed a seven-day stay at Oakwood Annapolis Hospital after Rader was found unresponsive by EMS.  [ECF No. 10-14, Tr. 649-51].  He had suffered acute respiratory failure, acute renal failure, and diabetic ketoacidosis, and again admitted to noncompliance with his diabetes management.  [*Id.*, Tr. 649, 656-57].  After being discharged in stable condition, Dr. Alrahomi noted Rader's lack of compliance with his scheduled follow up appointments.  [ECF No. 10-12, Tr. 583].  Rader's tobacco use continued

16

and his examination revealed a chronically ill appearance and edema of extremities, but no other abnormal results.  [*Id.*, Tr. 583-86].

Rader was scheduled to see Dr. Alrahomi again in July 2015, but his next and last visit of record was in August, at which time Dr. Alrahomi found Rader's diabetes to be improving.  [*Id.*, Tr. 593].  He found that Rader was compliant with education, follow up and medication.  [*Id.*].  Physical examination was again normal.  [*Id.*, Tr. 595-96].  This was his last visit of record.  [ECF No. 10-2, Tr. 26].

Though Dr. Papasifakis only saw Rader from June to December 2014, he provided a cardiac medical source statement in October 2015.  [ECF No. 10-13, Tr. 625-28].  He opined that he would need to see Rader again to offer a prognosis, but that Rader had no symptoms as of his last visit in December 2014.  [*Id.*, Tr. 625].  He was "uncertain" of the role of stress in bringing on Rader's symptoms, but nonetheless cleared Rader to perform low stress work.  [*Id.*, Tr. 626].  He found Rader to not require a job that permits shifting positions at will, but that he did have environmental restrictions requiring avoidance of all exposure to extreme cold and heat, high humidity, and cigarette smoke, with avoidance of concentrated exposure to soldering fluxes, solvents and cleaners, fumes, odors, gases, dust and chemicals.  [*Id.*, Tr. 626-27].  He gave no other restrictions, noting

17

that he would have to see Rader again to answer several of the form's
questions.  [*Id.*, Tr. 625, 626, 628].

## C.

Rader argues that the ALJ's RFC assessment conflicts with the
unanimous medical opinion evidence showing that he requires greater
restrictions.  The ALJ began his analysis with the June 2014 opinion of Dr.
Papasifakis, contained in standard medical notes, that Rader "cannot return
to work because of the severe cardiomyopathy and very low ejection
fraction and low blood pressure."  [ECF No. 10-9, Tr. 409].  The ALJ
afforded no weight to this opinion, as it is a disability determination, which
is reserved to the Commissioner.  [ECF No. 10-2, Tr. 28].  This reasoning is
not error.  *Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 340 (6th Cir.
2008) ("It is well-settled that the ultimate issue of disability is reserved to
the Commissioner.")

The ALJ next addressed an August 2014 opinion from state agency
consultant Michael Parish, M.D., who limited Rader to sedentary work,
occasional lifting of only ten pounds, and standing or walking for only two
hours of a normal work day.  [ECF No. 10-3, Tr. 87-89].  The ALJ afforded
little weight to this opinion, as well as the September 2014 opinion of Dr.
Alrahomi summarized above, for the same reasons, namely that both

18

opinions preceded Rader's pacemaker (defibrillator) implantation in 2015, after which Rader had improved cardiac function and associated symptoms when complying with medications and follow up examinations. [ECF No. 10-2, Tr. 28].

Rader argues that the ALJ impermissibly relied on his own lay analysis in coming to these conclusions. *See Simpson v. Comm'r of Soc. Sec.*, 344 F.App'x 181, 194 (6th Cir. 2009). But the ALJ is specifically tasked with ensuring that opinions are supported by medical evidence and not inconsistent with other substantial evidence. *Gentry*, 741 F.3d at 727-29; *Rogers,* 486 F.3d at 242-43. Here, the ALJ cited substantial inconsistent evidence post-dating both opinions. He noted that Rader's pacemaker was installed in October 2014, that Rader's follow ups with Dr. Papasifakis had entirely normal results upon examination, that Rader's hospitalizations in December 2014 and June 2015 for diabetic ketoacidosis were correlated with a lack of compliance with diabetes treatments, and that Rader's visits to Dr. Alrahomi were also almost entirely asymptomatic other than complaints of blurry vision. [ECF No. 10-2, Tr. 25-26]. There is no evidence that his cardiac condition post-pacemaker causes disabling impairments, nor is there evidence that his diabetes is disabling when he is

compliant with medication and doctor's visits.  The ALJ did not err in giving little weight to those opinions given their lack of evidentiary support.

The next opinion of record is that of Dr. Papasifakis from October 2015, in which he opined on Rader's environmental limitations.  [ECF No. 10-13, Tr. 625-28].  The ALJ afforded this opinion great weight and adopted the restrictions in the RFC.  [ECF No. 10-2, Tr. 22, 28-29].  Dr. Papasifakis stated that he would need to reexamine Rader before specifying further limitations, but he did mention that Rader had no symptoms on his last examination in December 2014.  [*Id.*, Tr. 625].

Lastly, the ALJ addressed a post-hearing opinion of medical consultant Howard Shapiro, M.D., that was provided on an interrogatory form.  [ECF No. 10-2, Tr. 19-21; ECF No. 10-20, Tr. 957-59].  Dr. Shapiro did not specify Rader's limitations, but instead found that his condition equaled Listings 4.02 (Chronic heart failure) and 4.12 (Peripheral arterial disease).  [ECF No. 10-20, Tr. 958].  The ALJ noted that Dr. Shapiro's finding regarding Listing 4.02 was based on Rader's ejection fraction of ten to fifteen percent in May 2014.  [ECF No. 10-2, Tr. 19-20; ECF No. 10-20, Tr. 958].  But as explained by the ALJ, Rader was outfitted with a LifeVest after May 2014 that never activated and later a pacemaker, and showed no

20

cardiac symptoms or risk of cardiac failure afterwards.  [ECF No. 10-2, Tr. 19-21; ECF No. 10-20, Tr. 958].

As to Listing 4.12, Dr. Shapiro referred to Dr. Papasifakis's notes from December 2014 and notes that Rader required "multiple drugs to maintain BP."  [ECF No. 10-20, Tr. 958].  But in November 2014 Rader told Dr. Papasifakis that he had stopped taking all his medications other than Coreg and Lyrica.  [ECF No. 10-11, Tr. 509].  In December his blood pressure was controlled at 108/72, he had no symptoms, and Dr. Papasifakis noted that he had "made remarkable progress . . . His appetite is good and he is regaining weight and is having no shortness of breath and there is no sign of cardiac decompensation."  [*Id.*, Tr. 503].  The ALJ noted that the record does not reflect a diagnosis of peripheral arterial disease or symptoms consistent with an equivalency of such.  [ECF No. 10-2, Tr. 20].

The ALJ further reasoned that Rader's medication lists were inconsistent throughout the record, that Rader did not consistently take all medications prescribed and that Dr. Shapiro's opinion was based on specific records that only reflected small snapshots within the first seven months of the alleged period of disability.  [*Id.*, Tr. 20-21].  Dr. Shapiro checked "yes" on the interrogatory form on the question about whether he

considered all evidence provided to him, but in the space provided for him
to cite the objective evidence in the record, he cited only records from May
to December 2014.  [ECF No. 10-20, PageID.957].  There was thus
substantial evidence to support the ALJ's finding that Dr. Shapiro's opinion
was based on an incomplete record, and a period too short to support a
disability. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (impairments must last
or be expected to last for a period of twelve months).  The ALJ provided
good reasons, supported by substantial evidence, for affording Dr.
Shapiro's opinion little weight.

**D.**

Rader argues that the ALJ erred in failing to have the medical
evidence reviewed by a consulting psychologist or psychiatrist before
finding Rader's mental impairments to be nonsevere.  Rader claims that
Social Security regulations strictly require a consulting medical expert's
opinion whenever there is evidence of a mental impairment, citing 42
U.S.C. § 421(h) ("An initial determination under subsection (a), (c), (g), or
(i) shall not be made until the Commissioner of Social Security has made
every reasonable effort to ensure **(1)** in any case where there is evidence
which indicates the existence of a mental impairment, that a qualified
psychiatrist or psychologist has completed the medical portion of the case

22

review and any applicable residual functional capacity assessment").  But Social Security regulations make clear that a medical expert will not always be utilized in making the determination.  20 C.F.R. § 404.1520a; *see also Bernal v. Bowen*, 851 F.2d 297, 302 (10th Cir. 1988) (discussing legislative history).

Rader is correct that it is the ALJ's responsibility to "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110 (2000).  But this does not create a duty to appoint a consulting psychologist or psychiatrist in every matter.  Where, as here, a claimant does not initially claim disability due to a mental impairment, there must be significant evidence of a possible disabling mental impairment before such a requirement is triggered.  *See Marcum v. Comm'r, Soc. Sec. Admin.*, 205 F.3d 1341 (6th Cir. 2000), *Robinson v. Barnhart*, 124 F. App'x 405, 411 (6th Cir. 2005).

The evidence supporting Rader's mental impairments—anxiety and depression—is scant.  The ALJ cited one record from July 2014 reflecting a claim of anxiety and depression, "but pt refuses to take meds to treat." [ECF No. 10-16, Tr. 748].  Then, in September 2014, Rader saw Dr. Alrahomi for depression and anxiety, which were noted as being "fairly controlled with no meds" with Rader again declining medication.  [ECF No.

23

10-12, Tr. 552].  Dr. Alrahomi made separate medical source statements

regarding Rader's anxiety and depression.  [ECF No. 10-10, Tr. 490-93;

ECF No. 10-11, Tr. 498-500].  But in November and December 2014 Rader

denied suffering from anxiety and depression [ECF No. 10-17, Tr. 845,

885], and the record is replete with normal psychological findings [ECF No.

10-8, Tr. 333, 347; ECF No. 10-9, Tr. 400-01, 404-05, 408-09; ECF No. 10-

10, Tr. 481-82, 484-85; ECF No. 10-13, Tr. 603-04, 606-07, 609-10; ECF

No. 10-14, Tr. 653; ECF No. 10-16, Tr. 737, 766, 785; ECF No. 10-17, Tr.

833, 838, 875, 880, 885].  And instead of attempting to support his claim of

mental limitations with evidence from the record, he opted to rest on a

procedural argument that does not hold up to scrutiny.  Thus, Rader has

not established error.

### E.

Rader's final argument relates to the ALJ's credibility determination,

though as he notes the credibility terminology is outdated.  The ALJ found

that Rader's "statements concerning the intensity, persistence and limiting

effects of [his] symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this

decision." [ECF No. 10-2, Tr. 23]. The ALJ's decision postdates Social

Security Ruling 16-3p, which eliminates use of the term "credibility" from

official policy and clarifies that a "subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, 2016 WL 1119029, at *1. *See also Rhinebolt v. Comm'r of Soc. Sec.*, No. 2:17-CV-369, 2017 WL 5712564, at *8 (S.D. Ohio Nov. 28, 2017), *adopted*, 2018 WL 494523 (S.D. Ohio Jan. 22, 2018) (noting that under SSR 16-3p, "an ALJ must focus on the consistency of an individual's statements about the intensity, persistence and limiting effects of symptoms, rather than credibility.").

Despite the linguistic clarification, courts continue to rely on pre-SSR 16-3p authority providing that the ALJ's credibility determinations are given great weight.  *See, e.g., Kilburn v. Comm'r of Soc. Sec.*, No. 1:17-CV-603, 2018 WL 4693951, at *7 (S.D. Ohio Sept. 29, 2018); *Duty v. Comm'r of Soc. Sec.*, No. 2:17-CV-445, 2018 WL 4442595, at *6 (S.D. Ohio Sept. 18, 2018).  Thus, an ALJ's subjective symptom evaluation should not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  At the same time, "such determinations must find support in the record."  *Rogers*, 486 F.3d at 241.

Rader initially incorporates his arguments on the prior topics into his credibility attack, and so the Court incorporates its reasons for denying those arguments here as well.  But Rader also argues that the ALJ committed reversible error by declining to consider his (Rader's) exemplary

work history in the subjective symptom evaluation.  Though 20 C.F.R. §

404.1529(c)(3) advises consideration of a claimant's prior work record in

evaluating his or her symptoms, there is no strict requirement that an ALJ

affirmatively discuss the claimant's work history in the subjective symptom

evaluation or in any other part of the decision.  *Dutkeiwicz v. Commissioner

of Social Security*, 663 F.App'x 430, 433 (6th Cir. 2016).  "[T]his circuit does

not follow the Second Circuit's procedure of automatically according a

Social Security claimant 'enhanced' or 'substantial' credibility based upon

her long-standing work history. . . [S]uch a procedure would run contrary to

the deference owed by a reviewing court to an ALJ's credibility

determination."  *Jones v. Comm'r of Soc. Sec.*, No. 4:14-CV-14417, 2016

WL 759439, at *2 (E.D. Mich. Feb. 26, 2016) (citations omitted).  Where, as

here, the ALJ's subjective symptom evaluation is well-supported by the

medical record—given Rader's substantial improvement in condition with

proper treatment—there is no reason to disturb the ALJ's determination.

### III. CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that

Rader's motion for summary judgment [ECF No. 15] be **DENIED**; that the

Commissioner's motion [ECF No. 20] be **GRANTED**; and the ALJ's

decision be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

<div style="text-align: right;">

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD

</div>

Dated: January 11, 2019                  United States Magistrate Judge

### <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ.

P. 72(b)(2). Failure to file specific objections constitutes a waiver of any

further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.

Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*,

638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation. *Willis v. Secretary of

HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers

Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection

must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 11, 2019.

<div style="margin-left:40%">

s/Marlena Rader
MARLENA RADER
Case Manager

</div>